# 24-1163-cv

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT



VICTOR CHEONG,

*Plaintiff-Appellant,*

*v.*

THE BANK OF EAST ASIA, LTD.,
THE BANK OF EAST ASIA, LTD.,
NEW YORK BRANCH,

*Defendants-Appellees.*

———————————

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF FOR PLAINTIFF-APPELLANT

LAW OFFICE OF
  ANDREA PAPARELLA, PLLC
*Attorneys for Plaintiff-Appellant*
134 West 29th Street, Suite 1001
New York, New York 10001
617-680-2400



# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iii

JURISDICTIONAL STATEMENT ....................................................1

QUESTIONS PRESENTED ...............................................................1

STATEMENT OF THE CASE ...........................................................2

    A.  Nature Of The Case .............................................................2

    B.  Preliminary Statement And Summary Of Argument ...................3

    C.  Proceedings Below .............................................................15

    D.  Statement Of Facts ............................................................18

STANDARD OF REVIEW ..............................................................31

ARGUMENT ...............................................................................32

    I.  The District Court Erred In Failing To Consider Allegations Arising Prior To 300 Days Before Cheong Filed His Charge With The EEOC—Those Acts Were Plausibly Part Of A Continuing Violation ...........................................................34

    II.  Even If Cheong's Claims Arising From Events Prior To November 5, 2023 Were Time Barred, Cheong At Least Plausibly Pled Sufficient Facts To Survive A Motion To Dismiss ..........................................................................37

        A.  Cheong Alleged Sufficient Facts To Plausibly Establish A Minimal Inference Of Discriminatory Animus Based On National Origin ..............................................39

        B.  Cheong Alleged Sufficient Facts To Plausibly Establish A Minimal Inference Of Discriminatory Animus Based On Sexual Orientation ..........................................42

C.   Cheong Alleged Sufficient Facts To Plausibly Establish
     A Minimal Inference Of Discriminatory Animus Based
     On National Origin .................................................................44

III.   Cheong Alleged Sufficient Facts To Plausibly Establish A
       Causal Link Between His Protected Activity And Retaliatory
       Action ......................................................................................48

CONCLUSION .....................................................................................52

CERTIFICATE OF COMPLIANCE WITH FRAP 32(A) .....................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Ashcroft v. Iqbal,
556 U.S. 662 (2009)......................................................................31, 33, 38

Bell Atl. Corp. v. Twombly,
550 U.S. 554 (2007)...............................................................................31

Blake v. Bronx Lebanon Hosp. Ctr.,
2003 WL 21910867 (S.D.N.Y. Aug. 11, 2003)...........................................34, 35

Bostock v. Clayton County, Georgia,
590 U.S. 644 (2020)................................................................................42

Buon v. Spindler,
65 F.4th 64 (2d Cir. 2023) .......................................................................31

Burlington Northern & Santa Fe Railway Company v. White,
548 U.S. 53 (2006).................................................................................49

Carr v. New York City Transit Authority,
76 F.4th 172 (2d Cir.2023) ......................................................................49

Cook v. Pan Am. World Airways, Inc.,
771 F.2d 635 (2d Cir.1985) ......................................................................34

Cornwell v. Robinson,
23 F.3d 694 (2d Cir.1994) .......................................................................35

Curtis et. al. v. Airborne Freight Corp.,
87 F.Supp.2d 234 (S.D.N.Y.2000) .............................................................35

Dunaway v. MPCC. Corp.,
2015 WL 4429276 (S.D.N.Y. July 16, 2015 ..................................................47

EEOC v. Port Auth. of N.Y. & N.J.,
768 F.3d 247 (2d Cir.2014) ......................................................................33

Espinal v. Goord,
  558 F.3d 119 (2d Cir. 2009) ...............................................51

Gallo v. Prudential Residential Servs., Ltd. P'ship,
  22 F.3d 1219 (2d Cir.1994) ................................................38

Gross v. Nat'l Broadcasting Co., Inc.,
  232 F.Supp.2d 58 (S.D.N.Y.2002) ...............................35, 36

Hazen Paper Co. v. Biggins,
  507 U.S. 604 (1993).............................................................45

Hewett v. Leblang,
  2012 U.S. Dist. LEXIS 93123 (S.D.N.Y. July 5, 2012).......................32

Holcomb v. Iona Coll.,
  521 F.3d 130 (2d Cir. 2008) .........................................38, 39

Jute v. Hamilton Sundstrand Corp.,
  420 F.3d 166 (2d Cir. 2005) ...............................................48

Lambert v. Genesee Hosp.,
  10 F.3d 46 (2d Cir.1993), overruled on other grounds by
  Greathouse v. JHS Sec. Inc., 784 F.3d 105 (2d Cir.2015) ...............34

Littlejohn v. City of N.Y.,
  795 F.3d 297 (2d Cir. 2015) ......................................*passim*

McDonnell Douglas Corp. v. Green,
  411 U.S. 792 (1973)...............................................*passim*

McMenemy v. City of Rochester,
  241 F. 3d 279 (2d Cir. 2001) ..............................................48

Meiri v. Dacon,
  759 F.2d 989 (2d Cir.1985) .................................................38

Nat'l R.R. Passenger Corp. v. Morgan,
  536 U.S. 101 (2002)...........................................35, 36, 37

O'Connor v. Consolidated Coin Caterers Corp.,
  517 U.S. 308 (1996)............................................................45

iv

O'Malley v. GTE Service Corp.,
    758 F. 2d 818 (2d Cir. 1985) ................................................................34

Petrosino v. Bell Atlantic,
    385 F.3d 210 (2d Cir. 2004) ...............................................................46

Port Auth. Police Asian Jade Soc. of N.Y. & N.J, Inc. v.
    Port Auth. of N.Y. and N.J.,
    681 F.Supp.2d 456 (S.D.N.Y. 2010) ..................................................37

Rose v. Port Auth. of N.Y. and N.J.,
    13 F.Supp.2d 516 (S.D.N.Y.1998) .....................................................35

Schwapp v. Town of Avon,
    118 F.3d 106 (2d Cir.1997) ................................................................38

Slattery v. Swiss Reinsurance Am. Corp.
    248 F.3d 87 (2d Cir. 2011) .................................................................51

Smith v. Bronx Cmty. Coll. Ass'n,
    No. 16 Civ. 3779 (JMF), 2017 WL 727546
    (S.D.N.Y. Feb. 23, 2017) ..............................................................41, 43

Sprint/United Mgmt. Co. v. Mendelsohn,
    552 U.S. 379 (2008) ............................................................................41

St. Mary's Honor Ctr. v. Hicks,
    509 U.S. 502 (1993) ............................................................................32

Ste. Marie v. E. R. Ass'n,
    650 F.2d 395 (2d Cir. 1981) ...............................................................35

Texas Dep't of Cmty. Affairs v. Burdine,
    450 U.S. 248 (1981) ............................................................................32

Vega v. Hempstead Union Free Sch. Dist.,
    801 F.3d 72 (2d Cir. 2015) ...........................................................*passim*

**Statutes**

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 1331 ......................................................................................1

29 U.S.C. § 623(a) ................................................................16

29 U.S.C. § 623 (c) ...............................................................16

29 U.S.C. § 623(d) ...............................................................48

42 U.S.C. § 2000 ..................................................................16

42 U.S.C. § 2000e-2(a)(1)................................................39, 42

42 U.S.C. § 2000e-3(a) .........................................................48

42 U.S.C. § 2000e-5(f)(3) ......................................................1

ADEA § 7(c) .........................................................................1

Civil Rights Act of 1964 Title VII................................*passim*

New York City Human Rights Law § 8-107(1)(a) ................16

New York City Human Rights Law § 8-107(19) ..................16

New York City Human Rights Law § 8-107(13)(b)...............16

New York State Human Rights Law § 292 ...........................16

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ......................16, 31

## JURISDICTIONAL STATEMENT

This is an appeal from an Opinion and Order, entered March 29, 2024, of the U.S. District Court for the Southern District of New York (Hon. Edgardo Ramos, D.J.), granting Defendants' motion to dismiss Plaintiff Victor Cheong's federal claims under: (1) Title VII of the Civil Rights Act of 1964, as amended ("Title VII"); and (2) the Age Discrimination in Employment Act (the "ADEA").

The District Court had jurisdiction over the dismissed federal claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3) (Title VII) and Sec. 7(c) of ADEA.

Judgment was entered on March 29, 2024. The Notice of Appeal was filed on April 26, 2024.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, because this is an appeal from a final decision of the district court.

## QUESTIONS PRESENTED

1.      Whether the district court erred when it failed to consider several of Plaintiff Victor Cheong's factual allegations on the grounds that they were time barred?

Yes. The district court improperly erred when it failed to consider several of Plaintiff Victor Cheong's factual allegations on the grounds that they were time barred.

2.      Whether the district court erred in dismissing Cheong's discrimination claims under Title VII and the ADEA?

Yes. The district court improperly construed the Second Amended Complaint and made factual findings against Cheong. Cheong at the very least plead plausible discrimination claims under Title VII and the ADEA.

3.      Whether the district court erred in dismissing Cheong's retaliation claims under Title VII and the ADEA?

Yes. The district court improperly construed the Second Amended Complaint and made factual findings against Cheong. Cheong at the very least plead plausible retaliation claims under Title VII and the ADEA.

## STATEMENT OF THE CASE

### A.      Nature Of The Case.

Cheong brought federal discrimination and retaliation claims in the district court under: (1) Title VII of the Civil Rights Act of 1964, as amended ("Title VII"); and (2) the Age Discrimination in Employment Act (the "ADEA"). He also brought non-federal claims, which the district court dismissed without prejudice. A202.

Cheong alleges that Defendant The Bank of East Asia, Ltd., and The Bank of East Asia, Ltd., New York Branch (together referred to as "BEA") discriminated

against him based on his national origin, sexual orientation, and age, and retaliated against him for complaining of such discrimination.

### B. Preliminary Statement And Summary Of Argument.

The lower court's decision to grant the motion to dismiss brought by Defendant The Bank of East Asia, Ltd., and The Bank of East Asia, Ltd., New York Branch (together referred to as "BEA"), should be reversed.

This case ultimately turns on whether plaintiffs alleging employment discrimination have a practical chance of getting their day in court. Upholding the decision to grant Defendants' motion to dismiss Cheong's claims would come perilously close to requiring that plaintiffs present direct evidence of discriminatory motivation in order to even access discovery. This Court has repeatedly recognized that circumstantial, indirect evidence is often the heart of an employment discrimination claim; employers are rarely so careless as to announce that they are acting unlawfully. This reality must be even more pronounced at the motion to dismiss stage, when plaintiffs have not even obtained discovery evidence to support their claims.

This Court should once more acknowledge the uphill battle that employees face in seeking practical protections for their civil rights and give Victor Cheong a fighting chance to prove his claims, which he at the very least plausibly plead.

The dismissed Second Amended Complaint at the very least plausibly pleads that Defendant The Bank of East Asia, Ltd., headquartered in Hong Kong, and The Bank of East Asia, Ltd., New York Branch (the "New York Branch"), run from Hong Kong, discriminated against Cheong.

First, reversal is proper because the district court improperly excluded acts as time barred when Cheong plausibly plead them as part of a continuing violation. See Section I, below. Cheong's alleged facts excluded by the lower court in this regard as time barred at least plausibly fall into the narrow continuing violation exception. Cheong is at the very least plausibly alleging ongoing policies and practices and thus all his alleged acts that would ordinarily be considered untimely are at least plausibly rendered timely even if on their own they would be untimely.

 Even without the continuing violation doctrine, it is well established that these prior acts may serve as evidence to aid Cheong in showing he has plausibly pled his timely claims. See Section II, below. Cheong may use acts that would be untimely to create a mosaic of evidence in support of a timely claim. See Section II, below.

Cheong has at the very least plausibly shown BEA has discriminated against him on the basis of national origin, sexual orientation, and age.

With a new BEA regime announced in 2019, Cheong, who held a business development role at BEA, pleads that actions taken against him after and before this

regime change, plausibly show that BEA discriminated against him because he is Filipino, not from Hong Kong, where Filipinos are widely held in low esteem. Nor is Cheong from another Asian country that BEA considers high in stature. Highlighting this plausibility, are these saliently plead facts:

- before and after the 2019 regime change, BEA only ever allowed top ranking positions be filled by individuals from Hong Kong, or from countries deemed comparable in status to Hong Kong, even for the New York Branch, A9;[1]

- with the new regime change, Maggie Wong, a Hong Konger, came to the New York Branch, and was given an unposted position title that paid her dramatically more than Cheong, even though she was woefully less qualified than Cheong, A14-A16;

- prior to the regime change and Wong's arrival from Hong Kong, Cheong enjoyed excellent performance reviews, bonuses, and salary increase, A17, and had been led to believe that he might eventually fill the General Manager position, A14;

---

[1] References to the Appendix are made as "A".

5

- after Wong's arrival, Cheong was deviously stripped of his management responsibilities and all of his direct reports, by way of an organizational chart that had Cheong's direct reports now directly reporting to Wong, A18;

- BEA gave Cheong's Head position to Wong, just with a different title, A18;

- With the regime change and arrival of Wong, BEA increased Cheong's new loan threshold target by more than three times the prior year's target, A18-A19, at least plausibly showing that BEA had predetermined Cheong was out, replaced by Wong;

- after Wong's arrival, Cheong's performance rating of 4 out of 5 in prior years suddenly dropped to 3 out of 5, A19, then 2, A21, then 1, A30, while the amounts Cheong originated in loans—which was his job—was higher in the years he received these lower ratings than in the years he was rated 4;

- Cheong's first rating below 4 was a year he originated $200,000,000 of loans, which was a large increase for him compared to prior years when he received ratings of 4, A19;

- Effective January 1, 2020, BEA, without considering the more qualified Cheong, replaced the General Manager of the New York Branch, Victor Li, who while from Hong Kong, had not lived there for decades and is an American citizen, with Maggie Wong from Hong Kong, who had only recently arrived in America, A20;

- the General Manager position was never posted, so neither Cheong nor anyone outside of Hong Kong could apply, A20;

- neither BEA's Hong Kong Head Office nor any of its branches in New York, Los Angeles, London, Singapore, Taiwan or Labuan, Malaysia have ever had a General Manager who was not a Hongkonger—or Singaporean, Taiwanese or Malaysian—who are considered equal to Hongkongers by BEA, A20;

- before receiving Victor Li's General Manager position, Wong originated less loans than Cheong and a significant portion of the loans she originated were deemed illegal by the United States, A20-21;

- once Wong who BEA sent from Hong Kong to New York became the General Manager of the New York Branch, she

lowered Cheong's performance rating even more—to a 2 out of 5, setting the foundation for terminating his employment for the pretextual reason of bad performance, A21;

- with Cheong's prior Head position now vacant due to Wong's rise to General Manager, Cheong was the obvious person to fill it, but instead Wong told Cheong she was not going to return the position to him, A21;

- Wong then hired Howard Hsu from Taiwan, a country BEA considers like Hong Kong in stature, to fill Cheong's prior Head position, for which Cheong was more qualified, A23-A24;

- after Hsu resigned, BEA designated Helen Shek, from Hong Kong and less qualified than Cheong, to serve as the Interim Head, A26;

- then BEA hired George Benakis, who is not Filipino, and is less qualified than Cheong, to the Head position Cheong once held, A31;

- Benakis was not only given Cheong's former position but Maggie Wong informed Cheong that Benakis would mainly

be responsible for soliciting new business, when Cheong had always held a business development role, A38;

- BEA further diminished Cheong's role by insisting he perform Business Manager responsibilities, A38, even though Cheong had historically never held that position but had always instead been in business development—Cheong was hired as Head of the Business Development Department;

- while demoting Cheong to a Business Manager position, BEA and Maggie Wong were simultaneously holding Cheong to a more stringent business development goal than he had ever had even when he was the Head of the Business Development Department, while telling Cheong that his primary role was no longer business development, A34, A38;

- BEA issued Cheong a bogus Performance Improvement Plan ("PIP"), A32, even though he outperformed both Maggie Wong and Benakis;

- BEA in 2023 replaced Maggie Wong with Francis Wong, also from Hong Kong, to serve as General Manager, A44, over not just Cheong, but also Benakis, who like Cheong was also

more qualified than Francis Wong to be General Manager; and

- finally, BEA fired Cheong in April 2023, A57 (even though Defendants did not seek dismissal of any termination of employment claim as part of their motion to dismiss, the termination of employment is still part of the mosaic of evidence).[2]

<u>See</u> Sections I-II, below.

These facts are just some of the facts Cheong alleges that show he has plausibly pled national origin discrimination.

---

[2] Fn. 6 of Defendants' memorandum of law in support of their motion to dismiss made clear that Defendants did not move to dismiss any termination claims. A111. Likewise, Defendants stated again in their memorandum of law that they did "not move to dismiss the retaliation claims related to Plaintiff's April 25, 2023 termination." A126. Defendants again made this clear in their reply memorandum of law. A175.

Fn. 1 of the Second Amended Complaint made clear:

On May 31, 2023, Cheong filed a New Charge of Discrimination with the Equal Employment Opportunity Commission alleging discrimination based on age, sexual orientation, national origin, and retaliation pursuant to Title VII and the ADEA, to capture events that happened after Cheong received a Notice of Right to Sue from the EEOC—including BEA's termination of his employment. Once Plaintiff receives a Notice of Right to Sue from the EEOC regarding his New Charge of Discrimination, he will seek leave to amend his Second Amended Complaint to allege such receipt. A8.

Cheong even alleges that rare evidence in employment cases—direct rather than circumstantial evidence. Cheong's allegations include a statement from the Head of Risk Management to the effect that Filipinos cannot be trusted. A117.

Cheong also plausibly pleads that BEA discriminated against him because of his sexual orientation. In addition to pleading that those preferred to him for promotion and otherwise held themselves out as heterosexual, whereas Cheong is gay, Cheong alleges other specific behavior and facts that at the very least plausibly show BEA was discriminating against Cheong because he is gay. See Section II.B, below.

Cheong also alleges that subordinates of Maggie Wong snooped through his office and asked probing questions about Cheong's traveling companions, after which Maggie Wong cryptically warned Cheong two times that people were talking behind his back. See Section II.B, below. Cheong further alleges that these subordinates were in a workplace clique with Wong. See Section II.B, below. When Cheong refused to sign the PIP, Wong, trying to pressure Cheong to sign the PIP, told Cheong that people were talking behind his back. A35. But when Cheong asked Wong if it was about the job, Wong would not answer. A35. See Section II.B, below. Taken together, there is certainly more than Cheong's bare subjective belief that Wong leveraged Cheong's sexual orientation to coerce him into signing the 2021 PIP. See Section II.B, below.

Cheong also plausibly pleads that BEA discriminated against him because of his age. <u>See</u> Section II.C, below.

Cheong is in his 60s. The new regime change heralded a workforce that skewed younger. <u>See</u> Section II.C, below.

Victor Li made statements at least plausibly suggesting Li did not actually want to retire when he did. And other multiple senior risk management personnel also retired when BEA welcomed its younger Co-CEOs. <u>See</u> Section II.C, below.

Maggie Wong is almost a decade younger than Cheong. George Benakis is more than a decade younger than Cheong. Francis Wong is also more than a decade younger than Cheong. Helen Shek, who Wong designated interim Department Head, A27, was significantly younger than Cheong. <u>Id.</u> All three of these individuals have less experience than Cheong and are less qualified than Cheong. <u>See</u> Section II.C, below. Preferring a substantially younger person who is less qualified over the substantially older more qualified employee raises an inference of age discrimination. <u>See</u> Section II.C, below.

And there are other alleged facts aiding Cheong in amply meeting his low requirement that he plausibly allege he has been discriminated against based on age.

Finally, Cheong plausibly alleges a claim that Defendants retaliated against him. <u>See</u> Section III, below. The adverse actions that give rise to a retaliation claim are broader than those that support a discrimination claim. <u>See</u> Section III, below.

Any action that could deter a reasonable employee from engaging in protected conduct can be retaliatory; a temporal link between the protected activity and the alleged retaliation can suggest an inference that the protected activity caused the retaliation. <u>See</u> Section III, below.

Here, in May 2021, Cheong complained to BEA's human resources department, after Wong and Benakis issued Cheong a performance improvement plan ("PIP") and contradictorily directed him to perform the duties of a Business Manager, when his role had always been business development, while at the same time giving him a higher business development goal than he had ever been given.

<u>After</u> he complained in May 2021, eleven minutes after he further complained, Wong informed Cheong for the first time that Benakis was "mainly responsible for soliciting new business for the department." A38. This is despite the fact that Cheong had historically always had a business development role—he was hired as Head of the Business Development Department. A14. Now Maggie Wong was relegating Cheong from a business development role to a Business Manager role. Right after he complained. Simultaneously, Wong was demanding Cheong meet a higher business development goal than ever before. This is at the very least plausibly retaliation.

On September 2, 2021, Cheong filed a Charge with the EEOC, and BEA retaliated against him that very month by excluding from a companywide survey.

George Benakis began obstructing Cheong's deals after Cheong filed his EEOC Charge. See Section III, below. In late 2021 or early 2022, Benakis deleted portions of Cheong's work on a loan that Cheong was developing, and Benakis further failed to respond to Cheong as Cheong attempted to coordinate the project. See Section III, below.

In January 2022, Benakis did not allow Cheong to report his own "Financial Measures," deviating from standard practice and incorrectly lowering Cheong's loan origination totals. See Section III, below.

In January 2022, just months after Cheong filed his Charge with the EEOC, BEA and Benakis gave Cheong a performance rating of 2 which was unjustifiable considering Cheong had originated more loans than Benakis—who Maggie Wong proclaimed as the person primarily responsible for loan origination, after Cheong complained internally—who originated $0 loans in 2021. $0. A41. Moreover Benakis did not count loans for Cheong that should have been counted. A42.

The lower court does not appear to have taken all factual allegations as true and to have drawn all reasonable inferences in Cheong's favor, as required on a motion to dismiss. Instead the lower court decision blames Cheong. See Section III, below. Benakis obstructed Cheong's loan origination duties and even deleted Cheong's work product following his discrimination charge; the district court failed to draw the inferences in Cheong's favor, and instead decided this was Cheong's

14

fault, and that Cheong "was struggling to work with Benakis" prior to his complaint. <u>See</u> Section III, below.

All of the above laid the foundation that BEA used to pretextually terminate Cheong's employment on April 25, 2023, less than three weeks after Cheong filed his first amended complaint. <u>See</u> Section III, below. Defendants expressly did not seek to dismiss any termination claim, but the termination decision is still part of the mosaic and assist Cheong with his minimal burden that Defendants have acted against him with retaliatory animus.

Those who contemplate asserting their civil rights during their employment with BEA now know the potential price: you can be ostracized from employee surveys, have your deals obstructed, your financial measures misreported, and you can even be fired weeks after attempting to engage the discrimination you face in a court of law. <u>See</u> Section III, below.

One could understand how a reasonable BEA employee might plausibly think twice.

For the reasons set forth below, the lower court's dismissal of Victor Cheong's claims under Title VII and the ADEA should be reversed.

### C.    Proceedings Below

The Second Amended Complaint was filed on June 2, 2023, in the United States District Court for the Southern District of New York. In his First Claim, Victor

Cheong asserts a claim of discrimination based on national origin and sexual orientation in violation of Title VII, 42 U.S.C. § 2000. In his Second Claim, Victor Cheong asserts a claim of unlawful retaliation in violation of Title VII, 42 U.S.C. § 2000. Victor Cheong's Third Claim asserts unlawful age discrimination and retaliation in violation of the ADEA, 29 U.S.C. §§ 623(a), (c). Victor Cheong also asserts claims of a hostile work environment, discrimination, and retaliation in violation of § 292 of the New York State Human Rights Law, as well as claims of retaliation, discrimination and a hostile work environment, interference with protected rights, and employer liability under of the New York City Human Rights Law, § 8-107(1)(a), (19), (13)(b), but the lower court dismissed these claims without prejudice, after deciding to dismiss the specific federal claims for which Defendants sought dismissal. A202.

The Defendants filed a motion to dismiss certain of the claims as time-barred and to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) in the alternative. Namely, Defendants moved to dismiss Cheong's claim of discrimination based on national origin and sexual orientation in violation of Title VII, his claim of unlawful retaliation in violation of Title VII, his claim of unlawful age discrimination and retaliation in violation of the ADEA, as well as his claims

16

under New York State and City Law. Defendants explicitly did not move to dismiss any claims arising from Cheong's termination in April 2023. [3]

No discovery took place prior to the motion to dismiss. No oral argument on the motion to dismiss was held. The United States District Court for the Southern District of New York, Judge Ramos presiding, issued its decision on March 29, 2024, granting the Defendants' motion and dismissing Cheong's then pending claims under federal law. The district court declined to adjudicate Cheong's claims under state and city law, as stated above.

Cheong timely filed his Notice of Appeal April 26, 2024.

---

[3] As stated above in Fn. 2, Fn. 6 of Defendants' memorandum of law in support of their motion to dismiss made clear that Defendants did not move to dismiss any termination claims. A111. Likewise, Defendants stated again in their memorandum of law that they did "not move to dismiss the retaliation claims related to Plaintiff's April 25, 2023 termination." A126. Defendants again made this clear in their reply memorandum of law. A175.

Fn. 1 of the Second Amended Complaint made clear:

On May 31, 2023, Cheong filed a New Charge of Discrimination with the Equal Employment Opportunity Commission alleging discrimination based on age, sexual orientation, national origin, and retaliation pursuant to Title VII and the ADEA, to capture events that happened after Cheong received a Notice of Right to Sue from the EEOC—including BEA's termination of his employment. Once Plaintiff receives a Notice of Right to Sue from the EEOC regarding his New Charge of Discrimination, he will seek leave to amend his Second Amended Complaint to allege such receipt. A8.

### D.   Statement Of Facts.

The Second Amended Complaint, A8, provides a detailed chronology of the events in this case and is relied upon in this appeal. Essential facts are as follows.

Headquartered in Central Hong Kong, Bank of East Asia, Limited ("BEA"), is a financial services and banking company. A12. It is currently Hong Kong's largest independent local bank. BEA is family-run; specifically, the Li family from Hong Kong runs the bank. Id.

In April 2016, Victor Li, then General Manager of the New York Branch, hired Cheong to be Head of the Business Development Department; recognizing Cheong's potential to assume greater responsibilities within BEA, Li told Cheong he could "expect advancement." A14. While Cheong's initial salary with BEA was $150,000, Victor Li indicated to Cheong when he interviewed him that he could expect to earn approximately $400,000.00 in the relatively near future and even possibly succeed him as the General Manager. A14-A15. This never materialized.

Cheong alleged in his complaint that at that time he was a 63-year-old, who is an American Citizen, born in the Philippines, and that he is an unmarried gay male. A10.

Before Cheong joined BEA, he worked for the Mizuho Bank, Ltd. ("Mizuho") for twenty years. A14. Mizuho is a large Japanese bank, substantially larger and with a more extensive business presence in the United States than that of Defendants;

Cheong ended his twenty-year tenure with Mizuho as Deputy General Manager and Head of the Loan Syndications Department. Id. After Mizuho, Cheong worked at China CITIC Bank International, Limited ("CITIC") in New York City, as Chief Lending Officer for five years. CITIC is a peer bank to BEA. Id. Cheong has an MBA from Harvard Business School and speaks Cantonese, Mandarin, and English. Id.

Cheong received his 2016 performance review from Victor Li in the first quarter of 2017, receiving a rating of 4 out of 5, with 5 being the highest. A17. Cheong is not aware of anyone receiving a rating of 5. Id. Cheong also received a bonus and a salary increase. Id.

In approximately late August 2017, BEA's transferred Maggie Kar-Lai Wong ("Wong"), a Hongkonger, from its Hong Kong Head Office to BEA, New York Branch, who hired her to the newly minted title of Senior Vice President, China Business, for the New York Branch. A15. BEA never posted this position, internally or externally, depriving Cheong and any other non-Hongkongers of any chance to apply or even express interest in the role. Id.

Wong's transfer followed substantial BEA losses in China; in response to these losses, BEA Chairman and Chief Executive David K.P. Li announced a restructuring of the Defendants' China Division and International Division. Id. Per the announcement, the China Division would continue to be supported by China

Business Department, then headed by Wong, a native of Hong Kong. Id. In a circular dated June 30, 2017, David K.P. Li announced that Wong would be transferred to the Overseas Branch Operations & Development Department effective July 1, 2017, and then to the New York Branch effective August 10, 2017. Id.

In her newly created Senior Vice President ("SVP") position, Wong assumed responsibilities that Cheong was already performing; however, BEA paid Wong a compensation package worth $240,000 to $340,000 more than Cheong's. Id. Further, hiring Wong to cultivate additional China-based business did not make sense; Victor Li decided around this time not to pursue more China business because of the deteriorating financial conditions of China-based companies and real estate developers, and when Cheong himself presented Li with loan opportunities involving China-based companies and real estate developers, Li was not interested. A16. Additionally, Victor Li told Cheong that his experiences dealing with customers from China at CITIC, along with his ability to speak Mandarin, were among the reasons that Li hired Cheong. Id.

By contrast, Wong came from the China Division in the Head Office, where BEA suffered significant losses and was forced to scale back its business in China. Id. Wong had no prior experience in banking in the United States, and while Cheong has a Harvard MBA, Wong, to Cheong's knowledge, has no graduate degree of any kind. Id. Combined with the five years at CITIC, during which Cheong honed his

20

skills in dealing with borrowers from China, Cheong was at least plausibly more qualified, if not considerably more so, to perform the role cut from whole cloth for Wong, a role in which Wong assumed duties Cheong was already performing for compensation worth $240,000 to $340,000 less. A15-A16.

Wong is younger than Cheong by around seven years, is married with a family, holds herself out as heterosexual, and wasted no time in telling Cheong that she is well connected to Brian David Li Man-bun of the Li family that runs BEA. A17. Wong cited among her accomplishments that she set up Defendants' Wuhan representative office, one of the many branches in China believed to have contributed to BEA's substantial losses. Id.

As alleged in the Second Amended Complaint, BEA's promotion of Wong to a position Cheong was more qualified to fill, and indeed was already performing, and then paying her hundreds of thousands of dollars more is emblematic of BEA's favoritism toward Hongkongers, and now younger employees. A17.

On April 19, 2018, Victor Li emailed a new organizational chart, and new Job Descriptions for both Cheong and Wong (all of which had an effective date of April 30, 2018). A17. A copy of Li's email and its attached organizational chart and Job Descriptions were attached to the Second Amended Complaint as Exhibit B. A17-A18. The organizational chart listed a new department — "China / Corporate Business" — and showed Wong as being the Head of it, with all of Cheong's

21

previous direct reports now directly reporting to Wong, not Cheong. A18. Wong's responsibilities included: (1) assisting the branch to achieve its KPIs and budget, (2) cultivating new business and customers with China / Hong Kong backgrounds, (3) maintaining cordial relationships with existing customers, (4) reviewing new credit proposals, (5) supervising and training team members, and (6) being responsible for the human resources and administrative issues of the Department: Cheong previously performed all of these duties. A18.

Shortly before this change, Victor Li rated Cheong's 2017 performance in approximately January 2018, again rating him 4 out of 5. Id.

Cheong nominally retained his position as the head of the Business Development Department, but the department was now a one man show. Id. Exhibit B lists Cheong as the only one in the department; every one of his previous direct reports now reported directly to Wong. Id.

After BEA in the organizational change stripped Cheong of managerial duties, BEA delivered Cheong a performance threshold target for new loan origination in the year 2018: $319,000,000. A19. This was almost a 300% increase from the $109,523,505 performance threshold for 2016 and more than a 300% increase from the $90,287,155 performance threshold for the year 2017. Id. Cheong attempted to reach this new target, but Wong, now situated in her SVP position, made it difficult for Cheong to have a Business Manager with whom to work on deals. Id. She pushed

her own deals over Cheong's, ensuring that Cheong's deals received only residual attention from Business Managers. Id.

Notwithstanding this new resistance, Cheong originated $200,000,000 of new loans, a significant increase over both 2016 ($126,894,062) and 2017 ($111,073,424). Id. Because he "only" roughly doubled his performance from 2017 and fell short of the $319,000,000, he received a 3 out of 5 on his 2018 performance review. Id. Cheong explained that his difficulty was securing the timely availability of staff support when he had new deal prospects in an attachment to his 2018 performance rating dated January 17, 2019. Id.

Effective January 1, 2020, BEA promoted Wong to General Manager, replacing Victor Li, her senior by about twelve years. A20. Prior to his retirement in February, Li expressed to Cheong that he did not wish to retire so soon. Id. Wong had been repeatedly and unjustifiably criticizing Li in her discussions with the Head Office. A19-A20. BEA never advertised the General Manager position to which it posted Wong, so once again Cheong and anyone else without deep connections to the Hong Kong decisionmakers had no opportunity to even apply. A20. BEA's New York branch has never been held by someone who is openly gay, nor has it ever been held by anyone who was not from Hong Kong or Singapore. Id.

During her time as SVP and Head of China Business, Wong originated around $334,500,000 in loans; since then, the United States has ordered divestment from

companies with ties to the People's Liberation Army, companies like China Overseas America, Inc., which received around $230,000,000 in loans that Wong originated. A20-A21, A29. Cheong in comparison, with less resources, originated new loans totaling around $360,000,000 during this period – none of which have since been deemed illegal. A21. Cheong surpassed Wong's figures without the direct report coverage that BEA transferred to Wong and with delayed support from Business Managers on his deals. Id.

With Wong's promotion, Cheong hoped to resume his managerial duties in the Department Head role that Wong vacated. Id. Instead, Wong admitted that BEA had initially given her Cheong's position upon her arrival, telling him that she "was not going to return the Head position to him." Id. Wong planned to hire someone new for the role, and Cheong would report to this new pick. Id.

During this meeting, Wong also told Cheong that people at the bank "were talking behind his back." Id. This comment unnerved Cheong since Wong's subordinates, like Yibo Li, displayed an unusual curiosity regarding Cheong's personal life, asking him questions regarding whom Cheong travels with on vacation and rummaging through his desk and personal iPhone. A21-A22.

In February 2020, Wong hired Howard Hsu ("Hsu") as Senior Vice President ("SVP") and "Head of Corporate & Real Estate Business." A23. Hsu's role entailed the same responsibilities that Cheong performed when he was Head of the Business

Development Department; however, the salary offered for this position was $225,000 - $250,000. A24. Hsu is from Taiwan and holds himself out to be heterosexual. Id. At this point, Cheong had nearly five years of experience at BEA and had already performed Hsu's duties before they were assigned to Wong. Id. Further, Wong directed Cheong to report to Hsu even though he did not report to Wong when she held the same position. Id.

March 2020 brought with it the COVID-19 pandemic and forced BEA's entire New York Branch to begin working from home. Id. BEA refused to provide Cheong with secured remote system software, leaving him unable to view files and records without manually asking other staff to send him what he needed. Id. Cheong only knows of a few other employees within the New York Branch to whom BEA also denied this software. A25. In June 2020, BEA disallowed the use of Outlook, Cheong's only means of sending and receiving emails; Wong was then forced to provide Cheong with software comparable to the remote system software. Id.

On May 18, 2020, Hsu emailed Cheong 2020 performance goals, including a loan solicitation goal of $192,500,000. Id. With the pandemic devastating New York's commercial real estate industry, Cheong asked Hsu to clarify whether the solicitation goal was for Hsu's entire six-person team or for Cheong personally, as well as how construction loans, which are typically minimally funded their first year,

would be counted towards the goal. Id. Hsu provided no answers for Cheong's questions other than to say that the goals "came directly from Wong." Id.

Hsu then resigned in August 2020. Hsu relayed to Cheong former General Manager Victor Li not Maggie Wong hired Hsu. A26. Wong disrespected Hsu in front of other New York Branch staff. Id. Hsu was categorized and treated by Defendants as an "ABC," which stands for "American Born Chinese." Id. Hsu "told Cheong that Defendants' Head Office should properly train managers before sending them to overseas offices where the customs and legal environments are different." A26.

Hsu was not the only BEA employee treated as an "ABC"; Former BEA Chief Financial Officer Susan Chan was considered by BEA staffers to be an "ABC." A23. Chan was demoted to Head of Accounting on May 3, 2021, through the same organizational chart that would demote Cheong to "Senior Business Manager." Id.

Wong appointed Helen Shek, a Hongkonger significantly younger than Cheong, as interim department head rather than Cheong, with experience performing Hsu's exact duties. Id. Throughout that same year, three senior managers within BEA New York's Risk Management department all retired and were replaced with individuals who were decades younger. A27.

The retiring Head of Risk Management, Kitty Sin ("Sin"), told Cheong that people from poor Asian countries, like Indonesia and the Philippines, have poor

credit track records and "cannot be trusted." A28. Although Cheong did not directly report to Risk Management, Risk Management had to approve all of Cheong's new deals, and Sin was aware that Cheong was Filipino during her tenure. Id.

In January 2021, Wong gave Cheong the lowest possible performance rating for 2020: 1 out of 5. A30. Even though Cheong's department head would normally conduct this review, Wong had not yet filled Hsu's position and performed Cheong's review entirely by herself. Id. During the review, after admitting that the performance goal regarding solicitation of $192,500,000 was for Cheong's entire department, she still criticized Cheong for failing to individually meet the collective team target. Id. This criticism came even though Cheong had solicited five loans worth $230,000,000 on his own. A3. Wong counted only $155,000,000 because two of the five loans were construction loans that would be minimally drawn the first year. Id. In the Excel spreadsheet form containing Cheong's 2020 performance evaluation, there is a hidden cell formula used in calculating performance ratings that will keep Cheong's rating at 1 out of 5 even if the loan solicitation figure is set to the $192,500,000 threshold figure or to $230,000,000, the actual value that Cheong solicited. Id. In other words, even if Cheong was credited with singlehandedly meeting a performance goal for six people in the first year of a global pandemic during which he had limited access to resources and unclear directives, he would still receive the lowest possible rating. Id.

27

In February 2021, Wong hired George Benakis as SVP and Head of Corporate & Real Estate Business. Id. According to his LinkedIn profile, Benakis had only about five years of commercial banking experience and no discernible managerial experience, compared to Cheong's 25 years of commercial banking experience, including years of managerial experience prior to even joining BEA. A32. Benakis has a law school degree rather than an MBA, and he is an American twelve years younger than Cheong who holds himself out as heterosexual. Id.

BEA and Wong caused Benakis to be paid approximately $60,000.00 - $85,000.00 annually more than Cheong. A41.

On April 30, 2021, Wong called Cheong, brought Benakis in on the call, and then issued Cheong a Performance Improvement Plan ("PIP") that called for Cheong to singlehandedly originate $100,000,000 in loans between May 1, 2021, and July 31, 2021. Id. Cheong was given one quarter to generate half the business that a team of six was expected to generate the entirety of 2021; furthermore, the PIP required that Cheong write five credit proposals / annual reviews during this same period, assignments that are the duty of the Business Managers. A33. On May 3, 2021, at 12:46 p.m., Wong emailed an organizational chart, backdated to May 1, 2021, referring to Cheong as "SVP & Senior Business Mgr." A34. This marked the first time that Cheong was ever associated with the title of Business Manager; no other Business Manager has a Senior Vice President title. A34-A35. Cheong objected to

the Business Manager duties and the loan generation target; when he did, Wong yelled at him and repeated that "people were talking behind his back." A35-A36.

On May 6, 2021, Cheong complained to Lauren Lemole ("Lemole") with Human Resources, alleging that Wong and Benakis assigned him the PIP for discriminatory reasons because he was "an older, single man from the Philippines." A36. Cheong pointed to discrepancies between his usual business development role and the Business Manager responsibilities that would now also count towards his performance review. A36-A37.

On May 14, 2021, eleven minutes after Cheong further complained, A37, Wong for the first time informed Cheong that Benakis was "mainly responsible for soliciting new business for the department" even though the PIP also evaluated Cheong's ability to originate new business. A38. Wong eventually changed her directive, writing to Cheong that if he met the loan origination goal, he would not need to perform the Business Manager duties, and the PIP was delayed and eventually dropped, showcasing its illegitimacy. A39-A40.

On September 2, 2021, Cheong filed a Charge of Discrimination with the Equal Employment Opportunity Commission; around this time, he was excluded from participation in a company-wide survey. A41. In late 2021 / early 2022, Benakis failed to respond to Cheong regarding a loan proposal Cheong developed; he also deleted portions of Cheong's work on the project. A41-A42. Although it is

customary for BEA employees to fill out their own "Financial Measures" section in performance evaluations, Benakis refused to allow Cheong to do this; additionally, Benakis scored Cheong at 0% for the "Ensure High Standards of Credit Underwriting" and gave him a 2 out of 5 overall even though Cheong met his requirements under the PIP. A42-A43.

On September 9, 2022, Maggie Wong announced that she was retiring, and Francis Wong, a 51-year-old Hong Kong native with only back-office experience, was hired to replace her, again without any posting that would have allowed Cheong or anyone else to pursue the role. A44-A45, A47. When Francis Wong introduced himself to Cheong, he told Cheong that the office's 2023 business strategy would involve selling down Risk Weighted Loan Assets ("RWAs"). A45. Francis Wong later convened a meeting with Cheong and Benakis to discuss RWA reduction. A47.

Francis Wong met with Cheong on February 7, 2023, to discuss Cheong's performance reviews; Cheong countered that Maggie Wong and Benakis (1) denied him on five loans, (2) allowed Benakis and others to use a credit line for their low priced loans while refusing to extend the same line to him, and that (3) Maggie Wong and others avoided responding to his communications regarding loan opportunities. A48-A49.

Cheong filed his amended complaint with the district court on April 5, 2023, and later this very month, on the morning of April 25, 2023, Francis Wong terminated Cheong's employment. A57.

## **STANDARD OF REVIEW**

This Court articulated the standard of review governing appeals from a 12(b)(6) motion to dismiss in Buon v. Spindler, 65 F.4th 64, 76 (2d Cir. 2023): "We review de novo a district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), accepting as true all factual allegations in the complaint and drawing all reasonable inferences in favor of the plaintiff."

Although the Supreme Court has clarified that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss, a plaintiff need only plead "enough facts to state a claim ... that is plausible." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007). In the case of employment discrimination claims, this Court announced that the facts to be alleged under Iqbal "need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination"; plaintiffs "need only give plausible support to a minimal inference of discriminatory motivation." See Littlejohn v. City of N.Y., 795 F.3d 297, 311 (2d Cir. 2015).

Interestingly, Defendants failed to cite Littlejohn in articulating the standard of review, A112-113; instead, they cited an unreported district court case prior to Littlejohn for the proposition that "a complaint is plausible if it pleads factual content that allows the court to reasonably infer that the defendant is liable for the misconduct alleged." A112 (citing Hewett v. Leblang, 2012 U.S. Dist. LEXIS 93123, at *14 (S.D.N.Y. July 5, 2012). Once again, Littlejohn commands that the allegations "need only give plausible support to a minimal inference of discriminatory motivation" at the motion to dismiss stage. Littlejohn, 795 F.3d at 311. (Emphasis added.)

## ARGUMENT

Clever people cleverly discriminate.

Mindful that claims of discrimination may be difficult to prove without evidence in an employer's possession, the Supreme Court outlined and developed a prima facie case that "eliminates the most common nondiscriminatory reasons" for an "adverse employment action." See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993). Crucially, however, McDonnell Douglas presents an evidentiary standard, not a pleading requirement; it does not create a heightened pleading standard "beyond Twombly's and Iqbal's demand for facial plausibility." See Vega v. Hempstead Union Free Sch.

Dist., 801 F.3d 72, 83-84 (2d Cir. 2015) (quoting EEOC v. Port Auth. of N.Y. & N.J., 768 F.3d 247, 254 (2d Cir.2014)).

In Littlejohn, this Court considered how the Iqbal plausibility standard applies to employment discrimination cases at the pleading stage: there, this Court announced that to survive a motion to dismiss, a plaintiff need only allege facts that, taken as true, provide "plausible support to the reduced requirements that arise under McDonnell Douglas." Littlejohn, 795 F.3d at 311. The Littlejohn decision stressed that since a "plaintiff cannot reasonably be required to allege more facts in the complaint than the plaintiff would need to defeat a motion for summary judgment," the facts to be alleged "need only provide plausible support to a minimal inference of discriminatory motivation." Id. In other words, "absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff ... has at least minimal support for the proposition that the employer was motivated by discriminatory intent." Id. at 311 (emphasis added).

For the reasons set forth below, the lower court's decision to grant the Defendant's Motion to Dismiss should be reversed. Cheong has at the very least provided minimal support in his Second Amended Complaint that BEA was motivated by discriminatory and retaliatory intent.

I.   **The District Court Erred In Failing To Consider Allegations Arising Prior To 300 Days Before Cheong Filed His Charge With The EEOC— Those Acts Were Plausibly Part Of A Continuing Violation.**

Under Title VII and the ADEA, a plaintiff has 300 days to initiate a civil action after an allegedly unlawful practice occurs. See O'Malley v. GTE Service Corp., 758 F. 2d 818, 820 (2d Cir. 1985). While this limitation typically bars claims based on allegations of conduct occurring more than 300 days prior to a plaintiff's EEOC Charge, an exception arises "when an otherwise time-barred claim is part of a 'continuing violation.'" Blake v. Bronx Lebanon Hosp. Ctr., 2003 WL 21910867, at *5 (S.D.N.Y. Aug. 11, 2003), citing Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir.1993), overruled on other grounds by Greathouse v. JHS Sec. Inc., 784 F.3d 105 (2d Cir.2015). When a continuing violation exists, a Title VII plaintiff need only "[file] an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination," and "all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." Lambert, 10 F.3d at 53, citing Cook v. Pan Am. World Airways, Inc., 771 F.2d 635, 646 (2d Cir.1985).

Cheong plausibly alleges a continuing violation when he "provide[s] 'proof of specific or ongoing policies or practices or ... specific and related instances of discrimination [which] are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" Blake, 2003 WL

21910867, at *5 (S.D.N.Y. Aug. 11, 2003), quoting <u>Cornwell v. Robinson</u>, 23 F.3d 694, 704 (2d Cir.1994). Cheong recognizes that as "a general rule, courts in the Second Circuit have viewed continuing violation arguments with disfavor." <u>Blake</u>, 2003 WL 21910867, at *5 (S.D.N.Y. Aug. 11, 2003), quoting <u>Curtis et. al. v. Airborne Freight Corp.</u>, 87 F.Supp.2d 234, 244 (S.D.N.Y.2000), citing <u>Rose v. Port Auth. of N.Y. and N.J.</u>, 13 F.Supp.2d 516, 520 (S.D.N.Y.1998). He further acknowledges that individual acts like "termination, failure to promote ... or refusal to hire" are "discrete acts" and that claims based each begin separate 300 day limitations periods; however, claims of a discriminatory "pattern or practice ... presumably can still form the basis of a continuing violation." See <u>Blake</u>, 2003 WL 21910867, at *5 (S.D.N.Y. Aug. 11, 2003), citing <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 110-13 (2002); <u>Gross v. Nat'l Broadcasting Co., Inc.</u>, 232 F.Supp.2d 58, 68 (S.D.N.Y.2002), citing <u>Morgan</u>, 536 U.S. n.9. Evidence of "discretionary promotion and transfer procedures may indeed strengthen the inference of a pattern or practice of purposeful discrimination" in some instances. <u>Ste. Marie v. E. R. Ass'n</u>, 650 F.2d 395, 405 (2d Cir. 1981).

Here, Cheong filed his charge with the EEOC on September 2, 2021, so claims arising from acts taken prior to November 5, 2020, would typically be time barred. Cheong's allegations, however, plausibly allege the existence of at least two such "pattern[s] or practice[s]": (1) BEA would only hire Asians from certain Asian

countries—not the Philippines—for the General Manager branch positions, including the General Manager branch position at the New York Branch, and (2) BEA was attempting to skew its employee and manager population (including for positions like the Head position Cheong held) to be younger and ensure that the employee population adheres to heterosexuality. Gross, 232 F.Supp.2d at 68, (S.D.N.Y.2002), citing Morgan, 536 U.S. n.9; A43, A78.

BEA has a new regime. David Li Man-kiu and Brian David Li Man-bun, both in their forties, are now Co-Chief Executives, replacing Dr. David K.P. Li, who was about 80 when he retired, effective July 1, 2019. A36. This change was announced on May 23, 2019.

Both brothers govern from Hong Kong, are not American citizens, and hold themselves out as heterosexual. A37. Cheong's surreptitious demotion with Maggie Wong's transfer into a newly minted role in the New York office that absorbed many of Cheong's roles at a much higher starting salary was, at least plausibly, a steppingstone to move Wong into the General Manager role without even considering unlawfully disfavored candidates like Cheong. A53, A78.

A regime change like BEA's is at least plausibly planned well before its announcement, so acts plausibly in accordance with that change should be deemed timely. And even before the regime change, Cheong at least plausibly alleges a continuing policy and practice of discrimination. Neither BEA's Hong Kong Head

Office nor any of its branches in New York, Los Angeles, London, Singapore, Taiwan or Labuan, Malaysia have ever had a General Manager who was not a Hongkonger—or Singaporean, Taiwanese or Malaysian—who are considered equal to Hongkongers.

Cheong describes discretionary and obscure hiring practices as BEA repeatedly filled the General Manager position without posting it, created new positions to divert existing roles, and allowed Cheong's bosses to hold Cheong to performance goals that had been assigned to his entire team or that included business manager responsibilities. A15, A32-A33, A45. All this occurred while Cheong outperformed the business development metrics of those bosses. A20-A21, A49.

As such, the lower court's finding that the continuing violation doctrine is inapplicable should be reversed.

## II. Even If Cheong's Claims Arising From Events Prior To November 5, 2023 Were Time Barred, Cheong At Least Plausibly Pled Sufficient Facts To Survive A Motion To Dismiss.

Even if the continuing violation doctrine does not apply, Cheong can still use past acts as evidence to plausible support claims arising from "related discrete acts so long as ... charges addressing those acts are themselves timely filed." Morgan, 536 U.S. at 102; Port Auth. Police Asian Jade Soc. of N.Y. & N.J., Inc. v. Port Auth. of N.Y. and N.J., 681 F.Supp.2d 456, 462 (S.D.N.Y. 2010) ("Otherwise admissible

evidence does not become inadmissible if the statute of limitations would have run on a claim that arose on that date.")

At the pleading stage, Cheong's factual allegations need only allege that: (1) he is a member of a protected class, (2) that he was qualified for the position he sought, (3) that he suffered an adverse employment action, and (4) that he can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation to survive a motion to dismiss. See McDonnell Douglas, 411 U.S. at 792-93 (1973); Littlejohn, 795 F.3d at 311 (2d Cir. 2015). This Court emphasized in Littlejohn how important it was "that the plaintiff be protected from early-stage dismissal," so even after Iqbal, Cheong "does not need substantial evidence of discriminatory intent" to survive a motion to dismiss. See Littlejohn, 795 F.3d at 307, 311 (2d Cir. 2015).

To put this burden into context, the Second Circuit "repeatedly expressed the need for caution about granting even summary judgment to an employer in a discrimination case where…the merits turn on a dispute as to the employer's intent." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008), citing Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) (emphasis added); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir.1994); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). In reversing a district court's grant of summary judgment, this Court stressed that "plaintiffs usually must rely on 'bits and pieces'

38

of information to support an inference of discrimination, i.e., a 'mosaic' of intentional discrimination." <u>Vega</u>, 801 F.3d at 86. Direct evidence of discrimination is not typical, so plaintiffs like Cheong must rely on a "mosaic" of individual instances that individually "might not amount to much," but "[t]aken together ..., they plausibly paint a mosaic of retaliation and an intent to punish (Plaintiff) for complaining of discrimination." <u>See</u> <u>Holcomb</u>, 521 F.3d at 137; <u>Vega</u>, 801 F.3d at 86. Because "'employers are rarely so cooperative as to include a notation in the personnel file that the (employment action) is for a reason expressly forbidden by law,'" courts must consider circumstantial evidence to balance out Cheong's evidentiary disadvantage. <u>Holcomb</u>, 521 F.3d at 141.

### A. Cheong Alleged Sufficient Facts To Plausibly Establish A Minimal Inference Of Discriminatory Animus Based On National Origin.

Cheong's national origin claims also arise under Title VII and are also analyzed within the <u>McDonnell Douglas</u> framework. <u>See</u> 42 U.S.C. § 2000e-2(a)(1); <u>McDonnell Douglas</u>, 411 U.S. at 792-93 (1973).

Cheong is: (1) Filipino, (2) has decades of commercial banking experience, (3) was passed over for promotion in favor of non-Filipinos; (4) was demoted after being passed over for promotion; and (5) ultimately fired. (Even though Defendants did not seek dismissal of any termination related claim, the termination is still part of the mosaic of evidence.)

Benakis's 2021 appointment to the SVP position replaced the demoted Cheong with an employee outside his protected class, which, taking as true Cheong's allegation that the SVP role reassigned all his managerial duties, in and of itself gives rise to an inference of discrimination. See Littlejohn, 795 F.3d at 312-13 (2d. Cir. 2015). The lower court makes no reference to this.

The lower court's opinion ignores Kitty Sin's comment that Filipino borrowers "cannot be trusted.". A28. While BEA attempts to minimize this comment with the strained distinction that it referred to borrowers rather than to Cheong himself, this comment plausibly suggests that the head of risk management, a department that had to approve all of Cheong's loans, held discriminatory animus against Filipinos; if she felt this way about Filipino borrowers, it is plausible that she held the same view of Filipino lenders, and this notion fits neatly into episodes in Cheong's "mosaic" where Cheong himself was denied credit lines available to lenders of other national origins and subjected to closer scrutiny on his lending deals than those other lenders. A28, A42; Vega, 801 F.3d at 86. While not directly in Cheong's reporting line, risk management personnel had to approve any loans Cheong proposed, so the notion that Sin and other risk management personnel would not have power to materially affect Cheong's employment seems far-fetched.

The lower court further makes no reference to Cheong's allegations of discrimination against coworkers. Evidence of similar discrimination against other

coworkers can support claims under Title VII. See Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 388 (2008). There, employees alleged that several supervisors acted with discriminatory intent, and the Court held that these allegations were not per se irrelevant, whereas Howard Hsu's confession to Cheong referred to a group of BEA managers that included Maggie Wong. Id. Cheong alleges that Hsu was considered an "ABC" before he left his role with BEA after only six months and that Hsu confided in Cheong before his departure that BEA should better train "managers before sending them to overseas offices where the customs and legal environments are different." A26. Cheong further alleges that former Chief Financial Officer Susan Chan was also referred to as an "ABC" and that Chan was demoted from her CFO position May 3, 2021. A23. Since an "inference of discrimination can arise from … 'invidious comments about others in the employee's protected group,'" Cheong alleges these incidents to indirectly support his claim that BEA employees harbored derogatory views of employees from less favorable national origins. Littlejohn, 795 F.3d at 312 (citation omitted).

Again, the district court correctly points out that an employee's subjective belief that adverse employment actions have a discriminatory animus cannot support a claim of animus, yet Cheong's claims do not solely rely on subjective belief: they present a mosaic of objective, circumstantial evidence. See Smith, 2017 WL 727546, at *2; Vega, 801 F.3d at 86. BEA never afforded Cheong or anyone else the benefit

41

of applying for its General Manager Position, it implanted Hong Kong Native Maggie Wong into the New York office in a created role that displaced Cheong's direct reports, and Maggie Wong issued Cheong a performance evaluation in 2021 that would have yielded him the lowest possible score even if he had hit an entire department's loan solicitation goal single-handedly. See A15, A31.

Accordingly, the lower court's dismissal of Cheong's national origin claims should be reversed.

### B. Cheong Alleged Sufficient Facts To Plausibly Establish A Minimal Inference Of Discriminatory Animus Based On Sexual Orientation.

Extending Title's VII's prohibition on from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's … sex," the Supreme Court has clarified that this broad protection encompasses discrimination based on sexual orientation. See 42 U.S.C. § 2000e-2(a)(1); Bostock v. Clayton County, Georgia, 590 U.S. 644, 652-56 (2020).

Once again, Cheong's only burden at the motion to dismiss stage is only allege that: (1) he is a member of a protected class, (2) that he was qualified for the position he sought, (3) that he suffered an adverse employment action, and (4) that he can sustain a minimal burden of showing facts suggesting an inference of discriminatory

motivation to survive a motion to dismiss. See McDonnell Douglas, 411 U.S. at 792-93 (1973); Littlejohn, 795 F.3d at 311 (2d Cir. 2015).

Cheong: (1) identifies as gay, (2) has decades of commercial banking experience generally and years of positive performance reviews with BEA, (3) was repeatedly passed over for promotion in favor of individuals who hold themselves out as heterosexual, (4) demoted, (5) placed on a PIP, criticized after years of excellent work, and (6) eventually terminated. (Even though the termination decision was not part of the motion to dismiss, it still is part of the mosaic of evidence).

The district court minimizes Cheong's allegations as nothing more than his subjective belief that adverse employment actions were taken against him based on sexual orientation, even though Cheong appropriately presents objective, indirect evidence. See Smith v. Bronx Cmty. Coll. Ass'n, No. 16 Civ. 3779 (JMF), 2017 WL 727546, at *2 (S.D.N.Y. Feb. 23, 2017); Vega, 801 F.3d at 86.

Namely, Wong's first comment that people were "talking behind his back" after an employee close to Wong had surreptitiously searched Cheong's desk and phone and questioned whom Cheong vacationed came during a tense meeting where Wong informed Cheong that he would not get his managerial role back. A21-A22. Wong repeated her comment during a call on which she pressured Cheong to sign a PIP containing duties assigned to business managers. A34-A35.

Those holding themselves out as heterosexual repeatedly passed over Cheong and assumed his roles. A21. For example, George Benakis took the SVP role in 2021; this was precisely the role that BEA gave to Maggie Wong without posting any vacancy, meaning that an individual plausibly outside of Cheong's protected class assumed much of Cheong's transferred responsibilities. See Littlejohn, 795 F.3d at 312-13 (2d. Cir. 2015) ("[A]n inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class"). Demotion within the Second Circuit captures instances where an employee's responsibilities are transferred. See id. at 313. Cheong thus alleges that BEA demoted him and replaced him with a heterosexual man over him in 2021, meaning that he timely alleges a scenario giving rise to an inference of discrimination. See id. at 312-13.

The lower court's dismissal of Cheong's sexual orientation claims should thus be reversed.

### C. Cheong Alleged Sufficient Facts To Plausibly Establish A Minimal Inference Of Discriminatory Animus Based On Age.

The ADEA exists to confront adverse employment actions based on "inaccurate and stigmatizing stereotypes" about employees over the age of 40; therefore, it prohibits "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's age." <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 609-10 (1993). As in discrimination cases generally, Cheong's only burden at the motion to dismiss stage is only to allege that: (1) he is a member of a protected class, (2) that he was qualified for the position he sought, (3) that he suffered an adverse employment action, and (4) that he can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation to survive a motion to dismiss. <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 792-93 (1973); <u>Littlejohn,</u> 795 F.3d at 311 (2d Cir. 2015).

Cheong's Second Amended Complaint alleged: (1) he was 63 years old, (2) had decades of commercial banking experience generally and years of positive performance reviews with BEA; (3) was passed over for promotion in favor of much younger less qualified employees; (4) was demoted, repeatedly; (5) given bad unjustifiable performance reviews after years of excellent performance reviews; (6) given unreasonable targets that even those who were promoted over him never attained; (7) was put on a bogus PIP for pretextual reasons; and (8) fired. (Even though Defendants did not seek dismissal of any termination claim, the termination is still part of the mosaic of evidence.)

Crucially, the Supreme Court has held that the ADEA "prohibits discrimination against those protected employees on the basis of age, not class membership" and the fact "[t]hat one member of the protected class lost out to another member is irrelevant." <u>O'Connor v. Consolidated Coin Caterers Corp.,</u> 517

U.S. 308 (1996). The Court in O'Connor further noted that the implication an employee "lost out <u>because of his age</u> … is more reliably indicated by the fact that his replacement was substantially younger" than by rigid reference to protected class status. <u>See id.</u>

The district court acknowledged that a plaintiff can show evidence of discriminatory intent either by alleging "direct evidence of intent to discriminate . . . or by indirectly showing circumstances giving rise to an inference of discrimination," A194, citing <u>Vega</u>, 801 F.3d at 87. But the district court appears to rest its decision on the fact that "Wong made no references to Cheong's age." A195. But <u>Vega</u> is clear that a plaintiff may allege facts that "indirectly show discrimination," as the district court acknowledged, A194, but then did not appear to adhere.

When Benakis took the role in 2021, he was a decade younger than Cheong and again assumed duties that should have been Cheong's. A31-A32. Although Cheong did not apply for the SVP role, he had "no knowledge of the vacancy before it was filled" because BEA created the position specifically to insert Maggie Wong into the New York Office. A12; <u>Petrosino v. Bell Atlantic</u>, 385 F.3d 210, 227 (2d Cir. 2004) (overruled on other grounds).

Cheong's allegations include a statement from Victor Li that he did not wish to retire and recount the coincidental retirement of three senior risk management persons in 2020; significantly younger replacements took each of the retirees' roles.

46

A20, A27. These events conjoin with the times that Cheong was passed over for promotion and displaced from his duties in favor of Maggie Wong and the time that BEA imported George Benakis into the SVP role. A15, A.31. Benakis was brought into the SVP position that relegated Cheong in February 2021, well after the time bar date and after an interaction where Maggie Wong told Cheong that she would not "return" his position. A21, A31. Also in 2021 was Maggie Wong's performance review in which Cheong was given the lowest possible score for his 2020 performance even though Cheong alleges

In its opinion and order granting BEA's motion to dismiss, the district court deems Dunaway v. MPCC. Corp., "instructive." 2015 WL 4429276 (S.D.N.Y. July 16, 2015); A195. The Dunaway court granted a motion for summary judgment rather than a motion to dismiss; although the plaintiff in Dunaway was not entitled on references to age as a plausible basis for alleging age discrimination, Dunaway was at the summary judgment stage. 2015 WL 4429276, at *5. Cheong, by contrast, has had no opportunity to obtain evidence through discovery; nevertheless, he has illustrated how the sharp decline in performance reviews and reassignment of his former roles follows neatly with BEA's new regime. A12.

Cheong alleges that BEA did not post the SVP position it gave to Wong in 2018, and he further alleges that the gave that position to Hsu in February 2020, and to Benakis in February 2021. A15, A23, A31. He further alleges that he spoke to

Maggie Wong in 2020 about recovering his Head position, which at least plausibly was an informal attempt to apply for the SVP role. A21.Wong and Benakis are a decade younger than Cheong, and Hsu left his managerial position at the New York Branch after only six months. A17, A25, A32 Wong expressed favoritism to significantly younger employees. A.22.

Accordingly, the lower court's dismissal of Cheong's age discrimination claims should be reversed.

## III.    Cheong Alleged Sufficient Facts To Plausibly Establish A Causal Link Between His Protected Activity And Retaliatory Action.

Title VII and the ADEA also make it an unlawful practice to retaliate against Cheong because "he has opposed any practice made an unlawful employment practice by this subchapter." See 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d). Once again, retaliation claims assessed under a burden shifting framework; Cheong carries his burden by demonstrating (1) participation in a protected activity, (2) that Defendants knew of the protected activity, (3) an adverse employment action, and (4) a causal connection between the protected activity and the adverse employment action. See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005); McMenemy v. City of Rochester, 241 F. 3d 279, 282-83 (2d Cir. 2001).

The Supreme Court clarified that the "adverse action" in a retaliation claim is "broader" than that contemplated under Title VII's anti-discrimination provision;

this Court has extended anti-retaliation provisions under Title VII and the ADEA to include any "'challenged action'" that "'a reasonable employee would have found ... materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" See Carr v. New York City Transit Authority, 76 F.4th 172, 178-79 (2d Cir.2023) (quoting Burlington Northern & Santa Fe Railway Company v. White, 548 U.S. 53, 68 (2006)).

After Cheong complained to Lauren Lemole with HR in May 2021 and subsequently filed a charge with EEOC in September, 2021, Defendants retaliated against him.

In May 2021 Cheong complained of discrimination. A36. After Cheong further complained to HR in May 2021, eleven minutes after Cheong further complained on May 14, 2021, A37, Wong informed Cheong for the first time that Benakis was "mainly responsible for soliciting new business for the department." A38. This is despite the fact that Cheong had historically always had a business development role—he was hired as Head of the Business Development Department. A14. Now Maggie Wong was relegating Cheong from a business development role to a Business Manager role. Right after he complained. Simultaneously, Wong was demanding Cheong meet a higher business development goal than ever before. This is at the very least plausibly retaliation.

After Cheong filed his Charge of Discrimination in September 2021, he was excluded from a companywide survey, faced impediments in originating loans in late 2021 and early 2022, and received a performance rating of 2 out of 5 at his next performance evaluation in January, 2022. A41-A42.

After Cheong filed his Charge in September, 2021, Cheong alleges that Benakis began obstructing Cheong's loan originations and even deleting his work between late 2021 and early 2022. Benakis further deviated from standard procedure when he refused to allow Cheong to enter figures in the Financial Measures section of his performance review within five months. A42. Cheong alleges that this deviation allowed Benakis to short Cheong's origination figure by $75 million. Although Wong's December 8, 2021, email states that Cheong met his credit underwriting target under the PIP, Benakis gave Cheong a 0% in that same January performance review. A42-A43. Cheong was excluded from the companywide survey in September 2021, the same month that he filed his Charge with the EEOC. A41.

Cheong filed his first Complaint on October 27, 2022; Benakis rated Cheong's final performance score at 32% the following January. A47. Cheong alleges that his 2022 performance targets were once again unfair and that he was not given access to credit lines available to other employees throughout that year. A40. Finally, after Cheong filed his Amended Complaint on April 5, 2023, he was terminated just three

weeks later, on April 25. While Defendants did not seek dismissal of any termination claim, A126, the termination still is part of the mosaic of evidence.

The district court cites Slattery v. Swiss Reinsurance Am. Corp. 248 F.3d 87, 95 (2d Cir. 2011), for the proposition that "when timing is the basis for a retaliation claim, 'gradual adverse job actions [that] began well before the plaintiff had ever engaged in any protected activity'" do not give rise to an inference of discrimination. A201. Slattery considered a two-year interval between the protected conduct and the retaliatory activity, whereas Cheong faced retaliatory activity immediately after his internal May 2021 complaint and within weeks and for four months after filing his Charge of Discrimination. Id. at 90-91. Then in the same month he filed his Second Amended Complaint he was fired.

Slattery also dealt with a motion for summary judgment whereas Cheong lacks the benefit of discovery evidence to bolster his claims. Id.

This Court has not "'drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated,'" and it has previously found that "the passage of only six months ... is sufficient to support an inference of a causal connection." Espinal v. Goord, 558 F.3d 119, 129-30 (2d Cir. 2009) (citation omitted).

The district court further finds that "nothing in [Cheong's] complaint indicates that these actions would not have been taken but-for his filing of the complaints" on

51

its way to dismiss Cheong's claims; however, this court has held that "the but-for causation standard does not alter the plaintiff's ability to demonstrate causation … through temporal proximity." <u>Vega</u>, 801 F.3d at 91.

The district court dismisses Cheong's allegations that Benakis deleted Cheong's work product and shorted Cheong's loan origination total by millions within months of his EEOC charge, blaming Cheong for "struggling to work with Benakis." A202. Accepted as true, these are not "gradual adverse job actions" so much as overt attempts to sabotage Cheong's performance metrics to drum up pretext with which Cheong could be terminated. A201. Cheong was fired three weeks after submitting his Amended Complaint; one could forgive a reasonable BEA employee for being deterred from complaining about any further episodes of discrimination.

As such, dismissal of Cheong's retaliation claims was completely unwarranted.

## <u>CONCLUSION</u>

For the foregoing reasons, the district court's decision to grant BEA's motion to dismiss should be reversed. Cheong has met his minimal plausibility standard.

Dated: July 3, 2024

Respectfully submitted,


By:  <u>/s/ Andrea M. Paparella</u>
Andrea M. Paparella

Law Office of Andrea Paparella, PLLC
134 W. 29th Street, Suite 1001
New York, NY  10001-5304
Telephone Number: 617-680-2400
Facsimile Number: 914-462-3287
Email Address: amp@andreapaparella.com

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,674 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Dated: July 3, 2024

                    Respectfully submitted,

            By:  /s/ Andrea M. Paparella
                   Andrea M. Paparella

                   Law Office of Andrea Paparella, PLLC
                   134 W. 29th Street, Suite 1001
                   New York, NY  10001-5304
                   Telephone Number: 617-680-2400
                   Facsimile Number: 914-462-3287
                   Email Address: amp@andreapaparella.com